Elaine A. Ryan (AZ Bar #012870)
Carrie A. Laliberte (AZ Bar #032556)
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
2325 E. Camelback Rd., Suite 300
Phoenix AZ 85016
Telephone:    (602) 274-1100
Email:        eryan@bffb.com
              claliberte@bffb.com

Patricia N. Syverson (AZ Bar #020191)
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
600 W. Broadway, Suite 900
San Diego, California 92101
Telephone:    (619) 798-4593
Email:        psyverson@bffb.com

Zach Crosner (*To Be Admitted Pro Hac Vice*)
CROSNER LEGAL, PC
9440 Santa Monica Blvd., Ste. 301
Beverly Hills, CA 90210
Telephone:    (310) 694-0459
Email:        zach@crosnerlegal.com

Counsel for Plaintiff and the Putative Class

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA
## PHOENIX DIVISION

| | |
|---|---|
| Joseph Larsen, as parent/legal guardian on behalf of A.L., and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MEDNAX Services, Inc.,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Joseph Larsen, as parent and legal guardian of A.L. ("Plaintiff"), by and through his undersigned counsel, brings this class action lawsuit against Defendant MEDNAX Services, Inc. ("Defendant" or "Mednax") on behalf of A.L. and all others similarly situated, and alleges, based upon information and belief and the investigation of his counsel as follows:

## INTRODUCTION

1.      Founded in 1979, Mednax is a physician-led healthcare organization that partners with hospitals, health care systems, and healthcare facilities to provide clinical services, revenue cycle management, and other administrative services.

2.      As part of its business, Mednax collects substantial amounts of personal and medical information, including:  (a) contact information such as patient names, guarantor names, addresses, and email addresses,; (b) personal information such as dates of birth, Social Security Numbers, driver's license numbers, government identification numbers, and/or financial account numbers; (c) health insurance information such as payor names, payor contract dates, policy information (such as type and deductible amount), and subscriber/Medicare/Medicaid numbers; (d) medical and/or treatment information such as dates of service, locations, services requested and/or procedures performed, diagnoses, prescription information, physician names, and Medical Record Numbers; (e)  billing and claims information such as invoices, submitted claims and appeals, and patient account identifiers used by providers (collectively, "PII").

3.      Plaintiff and Class members were required, as patients of Mednax, to provide Mednax with their PII, with the assurance that such information would be kept confidential and safe from unauthorized access.

4.      However, on or about June 19, 2020, Mednax discovered that unauthorized and unknown third-parties accessed Mednax's business email accounts through a phishing attack and compromised the security of patients' PII on or around June 17, 2020.  Mednax allowed the access to continue from June 17, 2020  through June 22, 2020 (the "Data

Case 0:21-cv-61255-RAR   Document 1   Entered on FLSD Docket 03/26/2021   Page 3 of 31

Breach"), and did not notify affected patients for almost six months, beginning December 16, 2020.

5.      Subsequently, Mednax revealed that unauthorized third-parties also accessed Mednax's business email accounts from May 9 through July 6, 2020; October 20, 2019 through April 16, 2020; and October 13, 2015 through March 13, 2020.

6.      Mednax maintained patient PII in a negligent or reckless manner by storing it on its computer network in a condition it knew or should have known was vulnerable to cyberattacks, given the multiple prior instances of phishing attacks on its email accounts, as well as the phishing attack that led to the Data Breach, and failed to disclose that Mednax did not have adequately robust computer systems and security practices to safeguard PII. Mednax further failed to properly train its employees and monitor the computer network and systems that housed patient PII, in order to timely discover the Data Breach and implement immediate remedial measures.  After discovery, Mednax also failed to timely and accurately notify Plaintiff and Class members of the Breach.

7.      As a result of Defendant's failure to implement and follow basic security procedures (including encryption, for example) and prevent the Data Breach, Plaintiff's and other Class members' PII is now in the hands of thieves.  Plaintiff and Class members have had to spend, and will continue to spend, significant amounts of time and money in an effort to protect themselves from the adverse ramifications of the Data Breach and will forever be at a heightened risk of identity theft and fraud.

8.      Plaintiff alleges claims for negligence, unjust enrichment, and violations of the Arizona Consumer Fraud Act, and seeks to compel Mednax to adopt reasonably sufficient security practices to safeguard the PII that remains in its custody in order to prevent incidents like the Data Breach from reoccurring in the future.

**PARTIES**

9.      Plaintiff Joseph Larsen is the parent and legal guardian of a minor whose initials are A.L., and is a citizen and resident of Phoenix, Arizona.  Plaintiff received written

notice of the Data Breach, and a true and correct copy of that Notice is attached hereto as Exhibit "A".  Plaintiff has always taken substantial precautions to protect himself and his child from identity theft, and has not been the victim of identity theft in the past.  Following the Data Breach, Plaintiff purchased credit monitoring (because Defendant did not offer it to him) and has spent and continues to spend his valuable time to protect the integrity of his and his child's personal information, finances, and credit – time which he would not have had to spend but for the Data Breach.  As a result of the Data Breach, Plaintiff will continue to be at heightened risk of financial fraud, medical fraud, identity theft, and attendant damages for years to come.

10.   Defendant Mednax is a healthcare services provider with a principal place of business located at 1301 Concord Terrace, Sunrise, Florida.

## JURISDICTION AND VENUE

11.   This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are, upon information and belief, numerous putative Class members who have different citizenship from Defendant.

12.   This Court has jurisdiction over Defendant because Defendant conducts business in and has sufficient minimum contacts with Arizona.

13.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District. Defendant conducts business in this District (including promoting, selling, marketing, and distributing Mednax brands and services at issue), and has caused harm to Plaintiff and Class members, many of whom reside in this District.

## STATEMENT OF FACTS

### A.  *The Data Breach*

14.   On or about June 19, 2020, Defendant discovered that unauthorized third-party hackers gained access to certain Microsoft Office 365-hosted business email accounts

through a successful phishing event.

15.     The Data Breach started on June 17 and continued through June 22, 2020 (three days after Defendant discovered it), and compromised the security, confidentiality, and/or integrity of Plaintiff and Class members' unencrypted PII.

16.     Mednax did not begin notifying individuals affected by the Data Breach until December 16, 2020.

17.     The Notice of the Data Breach sent to Plaintiff stated:

December 16, 2020

…

**What happened?**

On June 19, 2020, MEDNAX discovered that an unauthorized third party gained access to certain Microsoft Office 365-hosted MEDNAX business email accounts through phishing. "Phishing" occurs when an email is sent that looks like it is from a trustworthy source, but it is not. The phishing email prompts the recipient to share or give access to certain information. Upon discovery of this event MEDNAX immediately took action to prevent any further unauthorized activity, began an investigation, and engaged a national forensic firm.

Based on the investigation, the unauthorized party was able to access certain business email accounts between June 17, 2020 and June 22, 2020. The event was limited to a small number of business email accounts.  Those email accounts are separate from MEDNAX's internal network and systems, which were not involved in the event.  Even though a thorough investigation was conducted, it was not possible to conclusively determine whether personal information was actually accessed by the unauthorized party.  Based on the data analysis that was performed and ultimately completed in late November 2020, we were able to determine which individuals may have had personal information in the impacted business email accounts. Based upon our thorough review of this matter, we are not aware of any actual or attempted misuse of personal

information as a result of this event. However, we are notifying you because your child's personal information may have been in one or more of the impacted business email accounts.

**What information may have been involved?**

The patient information may have included: (1) patient contact information (such as patient name, guarantor name, address, email address, and date of birth); (2) health insurance information (payor name, payor contract dates, policy information including type and deductible amount and subscriber/Medicare/Medicaid number); (3) medical and/or treatment information (dates of service, location, services requested or procedures performed, diagnosis, prescription information, physician names, and Medical Record Numbers); and (4) billing and claims information (invoices, submitted claims and appeals, and patient account identifiers used by your child's provider). Please note that not all data fields may have been involved for all individuals.

**What we are doing.**

MEDNAX takes the security of personal information seriously. As soon as we discovered the phishing event, we immediately took action to prevent any further unauthorized activity, including resetting user passwords for business email accounts where unauthorized activity was detected. We have and continue to enhance our security controls as appropriate to minimize the risk of any similar event in the future.

**What you can do.**

The enclosed Reference Guide includes additional information on general steps you can take to monitor and protect your child's personal information. We encourage you to carefully review credit reports and statements sent from providers as well as your insurance company to ensure that all account activity is valid; any questionable charges should be promptly reported to the provider's billing office, or for insurance statements, to your insurance company.

**For more information**

If you have any questions about this matter or would like additional information, please refer to the enclosed Reference Guide, visit www.emailevent.kroll.com, or call toll-free 1-833-971-3267. This call center is open from 8:00 a.m. to 5:30 p.m. Central Time, Monday through Friday, excluding major U.S. holidays.

We regret that this event occurred and are very sorry for any distress or inconvenience this event may cause you.

Sincerely,

Mary Ann E. Moore
Chief Compliance Officer

18.     Mednax also offered a certain group of impacted patients (including those whose Social Security Numbers were compromised) twelve months of identity monitoring services, acknowledging that the affected patients are subject to an imminent threat of identity theft.

19.     Despite telling Plaintiff and Class members that it "immediately took action to prevent any further unauthorized activity," unauthorized third-parties also accessed Mednax's business email accounts between May 9 to July 6, 2020; October 20, 2019 to April 16, 2020; and October 13, 2015 to March 13, 2020.  Mednax also allowed the Data Breach to continue for three days after discovery.

### B.  Mednax's Obligations to Keep PII Secure

20.     Due to its business and operations, Mednax is obligated by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") to comply with a series of administrative, physical security, and technical security requirements in order to protect sensitive patient information. Among other things, the law mandates Mednax develop, publish, and adhere to a privacy practice.

21.     As such, Mednax recognizes its obligations under HIPAA to safeguard and protect patient PII.  It is well known that healthcare organizations have been the target of an increasing number of cyberattacks and must take adequate and reasonable steps to protect their systems from attack, regardless of who the intended or incidental victims are.

22.     Additionally, under various federal and state laws, regulations, industry practices, and common law, Mednax is bound to safeguard and protect the personal data of its patients from unauthorized disclosure to third parties.

### C. Prevalence of Cyberattacks and Susceptibility of the Healthcare Sector

23.     Cyberattacks come in many forms. Phishing attacks are among the oldest, most common, and well known.  In simple terms, phishing is a method of obtaining personal information using deceptive e-mails and websites. The goal is to trick an e-mail recipient into believing that the message is something they want or need from a legitimate or trustworthy source and to subsequently take an action such as clicking on a link or downloading an attachment. The fake link will typically mimic a familiar website and require the input of credentials. Once input, the credentials are then used to gain unauthorized access into a system.  "It's one of the oldest types of cyberattacks, dating back to the 1990s" and one that every organization with an internet presence is aware of.[1] It remains the "simplest kind of cyberattack and, at the same time, the most dangerous and effective."[2]

24.     Phishing attacks are well known and understood by the cyberprotection community and are generally preventable with the implementation of a variety of proactive measures such as sandboxing inbound e-mail[3], inspecting and analyzing web traffic,

---

[1] What is phishing? How this cyber attack works and how to prevent it, CSO Online, February 20, 2020, https://www.csoonline.com/article/2117843/what-is-phishing-how-this-cyber-attack-works-and-how-to-prevent-it.html (last visited March 1, 2021).

[2] *Phishing*, Malwarebytes, https://www.malwarebytes.com/phishing/ (last visited March 1, 2021).

[3] Sandboxing is an automated process whereby e-mail with attachments and links are segregated to an isolated test environment, or a "sandbox," wherein a suspicious file or URL may be executed safely.

penetration testing[4], and employee education, among others.

25.     In 2016, the number of U.S. data breaches surpassed 1,000, a record high and a 40% increase in the number of data breaches from the previous year.[5]  In 2017, a new record high of 1,579 breaches were reported, representing a 44.7% increase over 2016.[6]

26.     In 2018, the healthcare sector reported the second largest number of breaches among all measured sectors and the highest rate of exposure per breach.[7] Healthcare related data is among the most sensitive and personally consequential when compromised. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident…came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for health care they did not receive in order to restore coverage.[8]  Almost 50% of the victims lost their health care coverage as a result of the incident, while nearly one-third said their insurance premiums went up after the event. 40% of the customers were

---

[4] Penetration testing is the practice of testing a computer system, network, or web application to find security vulnerabilities that an attacker could exploit. The main objective of penetration testing is to identify security weaknesses. Penetration testing can also be used to test an organization's security policy, its adherence to compliance requirements, its employees' security awareness and the organization's ability to identify and respond to security incident. The primary goal of a penetration test is to identify weak spots in an organization's security posture, as well as measure the compliance of its security policy, test the staff's awareness of security issues and determine whether -- and how -- the organization would be subject to security disasters. *See* https://searchsecurity.techtarget.com/definition/penetration-testing (last visited March 1, 2021).

[5] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource* Center *and CyberScout* (Jan. 19, 2017), *available at* https://www.idtheftcenter.org/surveys-studys (last visited March 2, 2021).

[6] Identity Theft Resource Center, 2017 Annual Data Breach Year-End Review, *available at* https://www.idtheftcenter.org/images/breach/2017Breaches/2017AnnualDataBreachYearEndReview.pdf (last visited March 1, 2021).

[7] Identity Theft Resource Center, 2018 End-of-Year Data Breach Report, *available at* https://www.idtheftcenter.org/2018-end-of-year-data-breach-report/ (last visited March 1, 2021).

[8] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET, March 3, 2010, https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited March 1, 2021).

1   never able to resolve their identity theft at all. Data breaches and identity theft have a

2   crippling effect on individuals and detrimentally impact the economy as a whole.[9]

3        27.    Healthcare related data breaches have continued to rapidly increase. According

4   to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security

5   leaders reported having a significant security incident in the last 12 months, with a majority

6   of these known incidents being caused by "bad actors" such as cybercriminals.[10] "Hospitals

7   have emerged as a primary target because they sit on a gold mine of sensitive personally

8   identifiable information for thousands of patients at any given time. From social security and

9   insurance policies to next of kin and credit cards, no other organization, including credit

10  bureaus, have so much monetizable information stored in their data centers."[11]

11       28.    Indeed, the HIPAA Journal 2019 Healthcare Data Breach Report demonstrates

12  an upward trend in health sector data breaches over the past 10 years, with 2019 reflecting

13  more data breaches than any other year.[12] 2019 represented a 37.4% increase over breaches

14  reported in 2018 with a total number of patient records exposed increasing from 13,947,909

15  in 2018 to 41,335,889.[13]

16       29.    "Shockingly, the report disclosed that in 2019 alone, the healthcare records of

17  12.55% of the population of the United States were exposed, impermissibly disclosed, or

---

[9] *Id.*

[10] HIMSS, 2019 *HIMSS* Cybersecurity Survey, https://www.himss.org/himss-cybersecurity-survey (last visited March 1, 2021).

[11] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at* https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited March 1, 2021).

[12] HIPAA Journal, Healthcare Data Breach Statistics, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited March 1, 2021).

[13] *2019 Healthcare Data Breach Report*, HIPAA Journal, https://www.hipaajournal.com/2019-healthcare-data-breach-report/ (last visited March 1, 2021).

stolen."[14]

30.    As a healthcare services provider, Mednax knew, or should have known, the importance of safeguarding patient PII entrusted to it and of the foreseeable consequences if its data security systems were breached, including the significant costs that would be imposed on its patients as a result of a breach.  But Mednax failed to take readily available, widely known, and adequate cybersecurity measures to prevent the Data Breach from occurring.

**D.  Mednax Acquires, Collects, and Stores Plaintiff's and Class Members' PII**

31.    Mednax acquires, collects, and stores a massive amount of protected health related information and other personally identifiable data on its patients.

32.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' PII, Mednax assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' PII from unauthorized disclosure.

33.    Plaintiff and Class members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class members relied on Mednax to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**E.  The Value of PII and the Effects of Unauthorized Disclosure**

34.    Mednax was well-aware that the patient PII it collects and maintains is highly sensitive, and of significant value to those who would use it for wrongful purposes.

35.    PII is a valuable commodity to identity thieves.  As the FTC recognizes, identity thieves can commit an array of crimes including identify theft, medical fraud, and

---

[14] *Report Reveals Worst State for Healthcare Data Breaches in 2019*, Info Security Group, February 14, 2020, https://www.infosecurity-magazine.com/news/report-healthcare-data-breaches-in/ (last visited March 1, 2021).

financial fraud.[15] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites.

36.     While credit card information can sell for as little as $1-$2 on the black market, other more sensitive information can sell for as much as $363 according to the Infosec Institute. PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

37.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security Number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits (enabling them to collect, for example, millions of dollars in COVID-19 relief monies from state and federal governments), or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

38.     Moreover, it is not an easy task to change or cancel a stolen Social Security Number. An individual cannot obtain a new Social Security Number without significant paperwork and evidence of actual misuse. Even then, a new Social Security Number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new

---

[15] Federal Trade Commission, *Warning Signs of Identity Theft*, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited March 1, 2021).

Social Security number."[16]

39.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[17]  As explained above, the inclusion of PHI, such as the information exposed here, is even more valuable.

40.    At all relevant times, Mednax knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences if its data security systems were breached, including, the significant costs that would be imposed on patients as a result of a breach.

### F.  Mednax Failed to Comply with FTC Guidelines

41.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[18]

42.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[19] The

---

[16] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited March 1, 2021).

[17] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, *available at* http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited March 1, 2021).

[18] Federal Trade Commission, *Start With Security*, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited March 1, 2021).

[19] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited March 1, 2021).

guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

43.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[20]

44.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

45.     Mednax failed to properly implement basic data security practices. Its failure to employ reasonable and appropriate measures to protect against unauthorized access to PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

46.     Mednax was at all times fully aware of its obligation to protect the PII of patients because of its position as a healthcare provider.  Mednax was also aware of the significant repercussions that would result from its failure to do so.

### G.  Mednax Failed to Comply with Industry Standards

47.     Data exfiltrated from healthcare providers continues to be a high value target among cybercriminals.  In 2017, the U.S. healthcare sector experienced over 330 data

[20] FTC, *Start With Security*, *supra note* 18.

breaches, a number which continued to grow in 2018 (363 breaches).[21] The costs of healthcare data breaches are among the highest across all industries, topping $380 per stolen record in 2017 as compared to the global average of $141 per record.[22] As a result, both the government and private sector have developed industry best standards to address this growing problem.

48.     The Department of Health and Human Services' Office for Civil Rights ("DHHS") notes that "[w]hile all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large quantities of highly sensitive and valuable data."[23]  DHHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience which require a relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of PHI and PII; (b) educating and training healthcare employees on how to protect PHI and PII; and (c) correcting the configuration of software and network devices.  On January 5, 2021, HR 7898 was signed into law to encourage healthcare organizations to invest in security and adopt security frameworks to reduce financial penalties in the event of a data breach.  The bill amends the Health Information Technology for Economic and Clinical Health Act and requires the Office for Civil Rights to decrease the length and extent of audits and investigations of data breaches when recognized security best practices have been adopted

---

[21]  https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry; Identity Theft Resource Center, *2018* End of Year Data Brach Report, https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf (last visited March 1, 2021).

[22] *Id*.

[23] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA Journal, November 1, 2018, https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/ (last visited March 1, 2021).

prior to a data breach and to consider reducing any financial penalties in relation to those breaches.

49.     Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyberattacks, both because of the value of the individuals' PII they maintain and because as an industry they have been slow to adapt and respond to cybersecurity threats.[24] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of PII.

50.     Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Mednax chose to ignore them. These best practices were known, or should have been known by Mednax, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Plaintiff's and Class members' PII.

### H. Plaintiff's and Class Members Suffered Damages

51.     The ramifications of Defendant's failure to keep patient PII secure are long lasting and severe.  Once stolen, fraudulent use of such information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[25]

52.     The PII belonging to Plaintiff and Class members is private, sensitive in nature, and was left inadequately protected by Defendant, who did not obtain Plaintiff's or Class members' consent to disclose such information to any other person as required by applicable law and industry standards.

---

[24] *See, e.g.,* https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry; https://resources.*infosecinstitute*.com/category/healthcare-information-security/is-best-practices-for-healthcare/10-best-practices-for-healthcare-security/#gref (last visited March 1, 2021).

[25] 2014 LexisNexis True Cost of Fraud Study, https://www.lexisnexis.com/risk/*downloads*/assets/true-cost-fraud-2014.pdf (last visited March 1, 2021).

53.     Upon receiving the Notice, Plaintiff immediately took action to investigate whether the breach resulted in any fraud.  Plaintiff contacted his creditors and reviewed his credit reports to determine if any fraudulent charges or activity appeared.  He made sure his credit was frozen, and continues to monitor his credit reports and to undertake additional safeguards such changing passwords, etc.  Plaintiff also purchased credit monitoring services because he was not offered any by Defendant.

54.     Plaintiff has spent and continues to spend his valuable time to protect the integrity of his personal information, finances, and credit—time which he would not have had to expend but for the Data Breach.  This time is work, is compensable, and is minimally valued at minimum wage.

55.     Plaintiff and Class members have suffered actual injuries from having their PII exposed as a result of the Data Breach, including, but not limited to: (a) damages resulting from taking the time to search for fraudulent activity; to change banks, bank accounts and debit and credit cards; to purchase credit monitoring and identity theft protection; to call their creditors to provide them with notice of the breach; and to otherwise attempt to protect their financial accounts; (b) damages to and diminution in the value of their PII—a form of intangible property that the Plaintiff entrusted to Mednax as a condition of receiving services; and (c) imminent and impending injury arising from the increased risk of fraud and identity theft.

56.     As a result of the Data Breach, Plaintiff and Class members will continue to be at heightened risk for financial fraud, medical fraud, identity theft, and attendant damages for years to come.

57.     The Data Breach was a direct and proximate result of Mednax's failure to: (a) properly safeguard and protect Plaintiff's and Class members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class

members' PII; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

58.     Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately invest in data security measures, despite its obligations to protect PII. Had Defendant remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, particularly because it was on notice of the vulnerability in its systems given the several prior data breaches, it would have prevented the intrusions into its systems and, ultimately, the theft of PII.

59.     As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[26]

60.     To date, Mednax has not offered identity monitoring services to Plaintiff nor to many Class members, and has offered inadequate 12-month identity monitoring services to certain other Class members (including those whose Social Security Numbers were compromised). These services are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud and they entirely fail to provide any

---

[26] U.S. Department of Justice, Office of *Justice* Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013 *available at* https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited March 1, 2021).

compensation for the unauthorized release and disclosure of Plaintiff's and Class members' PII and PHI.

61.   As a result of the Defendant's failures to prevent the Data Breach, Plaintiff and Class members have suffered, will suffer, or are at increased risk of suffering:

a.   The compromise, publication, theft, and/or unauthorized use of their PII;

b.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

c.   Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

d.   The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PII in its possession; and

e.   Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class members.

62.   In addition to a remedy for the economic harm, Plaintiff and Class members maintain an undeniable interest in ensuring that their PII is secure, remains secure, and is not subject to further misappropriation and theft.

//

//

**CLASS ACTION ALLEGATIONS**

63.     Plaintiff seeks relief individually and as representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of an Arizona-Only class defined as follows:

> All Arizona residents whose PII was compromised as a result of the Data Breach (the "Class").

64.     Excluded from the Class are Mednax and any of its affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

65.      Plaintiff hereby reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

66.     The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

67.     **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the members of the Class are so numerous that the joinder of all members is impractical.  The Data Breach implicates approximately 1,290,670 individuals.

68.     **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class members. The common questions include:

   a.  Whether Mednax had a duty to protect its patients' sensitive PII;

   b.  Whether Mednax knew or should have known of the susceptibility of its systems to a data breach;

   c.  Whether Mednax's security measures to protect its systems were reasonable in light of best practices recommended by data security experts;

    d.  Whether Mednax was negligent in failing to implement reasonable and adequate security procedures and practices;

    e.  Whether Mednax's failure to implement adequate data security measures allowed the Data Breach to occur;

    f.  Whether Mednax's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the unlawful exposure of the Plaintiff's and Class members' PII;

    g.  Whether Plaintiff and Class members were injured and suffered damages or other losses because of Mednax's failure to reasonably protect its systems and data network; and,

    h.  Whether Plaintiff and Class members are entitled to relief.

69.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of other Class members.  Plaintiff and Class members all had their PII exposed in the Data Breach. Plaintiff's damages and injuries are akin to other Class members, and Plaintiff seeks relief consistent with the relief sought by the Class.

70.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because he is a member of the Class he seeks to represent; is committed to pursuing this matter against Mednax to obtain relief for the Class; and has no conflicts of interest with the Class. Moreover, Plaintiff's attorneys are competent and experienced in litigating class actions, including privacy litigation of this kind. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class' interests.

71.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit

litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Mednax, and thus, individual litigation to redress Mednax's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

72. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Mednax, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

73. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

        a. Whether Mednax owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

        b. Whether Mednax's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

        c. Whether Mednax's failure to institute adequate protective security measures amounted to negligence;

     d.  Whether Mednax failed to take commercially reasonable steps to safeguard patient PII;

     e.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach; and

     f.  Whether Mednax failed to comply with its statutory and regulatory obligations.

74.    Finally, all members of the proposed Class are readily ascertainable. Mednax has access to its patients' names and addresses affected by the Data Breach. Using this information, Class members can be identified and ascertained for the purpose of providing notice.

## FIRST CAUSE OF ACTION
## NEGLIGENCE

75.    Plaintiff restates, realleges and incorporates by reference all preceding paragraphs, as if fully set forth herein.

76.    As a condition of receiving services, Plaintiff and Class members were obligated to provide Mednax with their PII.

77.    Plaintiff and Class members entrusted their PII to Mednax with the understanding that Mednax would safeguard their information.

78.    Mednax had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class members could and would suffer if that information was wrongfully disclosed.

79.    Mednax had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.  This duty includes, among other things, designing, maintaining, and testing Mednax's security protocols to ensure that individuals' PII in Mednax's possession was adequately secured and protected and that employees tasked with maintaining such

information were adequately trained on cybersecurity measures regarding the security of such information.

80.     In addition, Section 5 of the FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Mednax, of failing to use reasonable measures to protect PII.  The FTC publications and orders described above also form part of the basis of Mednax's duty.

81.     Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices and procedures. Mednax knew of or should have known of the inherent risks in collecting and storing PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, the current cyberscams being perpetrated, and that it had inadequate employee training and education and IT security protocols in place to secure the PII of Plaintiff and the Class.

82.     Mednax's own conduct created a foreseeable risk of harm to Plaintiff and Class members. Its misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Its misconduct also included its decision not to comply with industry standards for the safekeeping and encrypted authorized disclosure of the PII of Plaintiff and Class members.  Mednax's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class members.

83.     Plaintiff and Class members had no ability to protect their PII that was in Mednax's possession.

84.     Mednax was in a position to protect against the harm suffered by Plaintiff and Class members as a result of the Data Breach.

85.     Mednax had a duty to put proper procedures in place in order to prevent the unauthorized dissemination of Plaintiff's and Class members' PII.

86. Mednax admitted that Plaintiff's and Class members' PII was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

87. Mednax, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class members by failing to exercise reasonable care in protecting and safeguarding their PII in deviation of standard industry rules, regulations, and practices while it was within Mednax's possession or control.

88. Mednax, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of PII.

89. Mednax, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class members by not immediately acting to stop the Data Breach but instead delaying until 3 days after learning of the Data Breach to act.

90. Mednax, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class members by delaying until 6 months after discovering the Data Breach to notify Plaintiff and Class members, and further breached its duty by failing to adequately disclose to Plaintiff and Class members the existence, and scope of the Data Breach.

91. But for Mednax's wrongful and negligent breach of duties owed to Plaintiff and Class members, Plaintiff's and Class members' PII would not have been compromised.

92. There is a temporal, logical, and close causal connection between Mednax's failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiff and the Class.

93. As a result of Mednax's negligence, Plaintiff and Class members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; time spent monitoring, addressing, and correcting the current and future consequences of the Data

Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

**SECOND CAUSE OF ACTION**
**UNJUST ENRICHMENT**

94.     Plaintiff restates and realleges and incorporates by reference all preceding paragraphs, as if fully set forth herein.

95.     Plaintiff and Class members conferred a benefit on Defendant by purchasing goods and services from Defendant and, in so doing, were required to provide Defendant with their PII.  In exchange, Plaintiff and Class members should have received the benefit of Defendant's reasonable efforts to safeguard PII with adequate data security.

96.     Instead, Defendant enriched itself by the savings on expenses related to data security measures to safeguard the PII in its possession.  In lieu of providing a reasonable and adequate level of security for its industry, Defendant saved money and increased profits by omitting effective and/or utilizing ineffective, and somewhat cheaper, security measures.

97.     Defendant knew that Plaintiff and Class members conferred benefits which Defendant accepted and used to further its business purposes.

98.     The monies Mednax received from Plaintiff and Class members were used, in part, to pay for use of Mednax's network and the administrative costs of data management and security.

99.     Under the principles of equity and good conscience, Defendant should not be permitted to reap such benefits because Defendant failed to implement appropriate data management and security measures.

100.     Defendant acquired Plaintiff's and Class members' PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

101.     Plaintiff and Class members have no adequate remedy at law.

102.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (i) actual identity

theft; (ii) the loss of the opportunity to restrict how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class members.

103.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm.

104.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them.

### THIRD CAUSE OF ACTION
### ARIZONA CONSUMER FRAUD ACT ("ACFA")
### Ariz. Rev. Stat. §§ 44-1521, *et seq.*

105.    Plaintiff restates and realleges and incorporates by reference all preceding paragraphs, as if fully set forth herein.

106.    The ACFA provides in pertinent part:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in face been

misled, deceived or damaged thereby, is declared to be an
unlawful practice.

A.R.S. § 44-1522.

107.    Plaintiff and Class members are "persons" as defined by A.R.S. § 44-1521(6),
Mednax provides "services" as that term is included in the definition of "merchandise" under
A.R.S. § 44-1521(5), and Mednax is engaged in the "sale" of "merchandise" as defined by
A.R.S. § 44-1521(7).

108.    Mednax engaged in deceptive and unfair acts and practices, misrepresentation,
and the concealment, suppression, and omission of material facts in connection with the sale
and advertisement of "merchandise" (as defined in the ACFA) in violation of the ACFA,
including but not limited to the following:

      a.  Failing to maintain sufficient security to keep Plaintiff's and
Class members' confidential financial, medical, and personal
data from being hacked and stolen;

      b.  Misrepresenting material facts, by representing that it did and
would comply with the requirements of relevant federal and
state laws pertaining to the privacy and security of Plaintiff's
Class members' PII;

      c.  Omitting, suppressing, and concealing the material fact of the
inadequacy of the privacy and security protections for
Plaintiff's and Class members' PII when demanding Plaintiff
and Class members provide their PII as a condition of service,
which should have been disclosed in all communications with
Plaintiff and Class members, including, but not limited to the
notice of privacy practices and other documents provided to
Plaintiff and Class members at the time of service;

d.  Engaging in unfair, unlawful, and deceptive acts and practices by failing to maintain the privacy and security of Plaintiff's and Class members' PII, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Data Breach. These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws;

e.  Engaging in unlawful, unfair, and deceptive acts and practices by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiff's and Class members' PII from further unauthorized disclosure, release, data breaches, and theft; and

f.  Failing to immediately notify Plaintiff and Class members of the Data Breach, waiting 6 months to do so.

109.   The above unlawful, unfair, and deceptive acts and practices by Mednax were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

110.   Mednax knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiff's and Class members' PII and that risk of a data breach or theft was high. Mednax's actions in engaging in the above-named deceptive acts and practices were knowing and willful, and/or wanton and reckless with respect to the rights of members of the Class.

111.   As a direct and proximate result of Mednax's deceptive acts and practices, Plaintiff and Class members suffered an ascertainable loss of money or property, real or personal, as described above, including money spent for credit monitoring services, the lost opportunity cost of their time minimally valued at minimum wage to monitor their accounts

for instances of identity theft, the loss of their legally protected interest in the confidentiality and privacy of their PII.

112.    Plaintiff and Class members seek relief under the ACFA including, but not limited to, injunctive relief, actual damages, treble damages for each willful or knowing violation, and attorneys' fees and costs.

**WHEREFORE**, Plaintiff, as parent and legal guardian of A.L., on behalf of A.L. and all others similarly situated, respectfully requests the following relief:

a.  An Order certifying this case as a class action;

b.  An Order appointing Plaintiff as the class representative;

c.  An Order appointing undersigned counsel as class counsel;

d.  An Order compelling Defendant to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that it unjustly received;

e.  A mandatory injunction directing Defendant to adequately safeguard Plaintiff's and Class members' PII by implementing improved security procedures and measures;

f.  An award of damages;

g.  An award of costs and expenses;

h.  An award of attorneys' fees; and

i.  Such other and further relief as this court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial as to all issues triable by a jury.

/ /

/ /

DATED this 25th day of March 2021

                              BONNETT, FAIRBOURN, FRIEDMAN
                              & BALINT, P.C.

                              By:    *Elaine A. Ryan*
                                     Elaine A. Ryan (AZ Bar #012870)
                                     Carrie A. Laliberte (AZ Bar #032556)
                                     2325 E. Camelback Rd., Suite 300
                                     Phoenix AZ 85016
                                     Telephone:   (602) 274-1100
                                     eryan@bffb.com
                                     claliberte@bffb.com

                                     Patricia N. Syverson (AZ Bar #020191)
                                     BONNETT, FAIRBOURN,
                                     FRIEDMAN & BALINT, P.C.
                                     600 W. Broadway, Suite 900
                                     San Diego, California 92101
                                     Telephone:   (619) 798-4593
                                     psyverson@bffb.com

                                     Zach Crosner (*To Be Admitted Pro
                                     Hac Vice*)
                                     CROSNER LEGAL, PC
                                     9440 Santa Monica Blvd., Ste. 301
                                     Beverly Hills, CA 90210
                                     Telephone:   (310) 694-0459
                                     Email: zach@crosnerlegal.com

                                     Counsel for Plaintiff and the
                                     Putative Class